# PARISH *v.* McGOWAN.

ATTORNEY AND CLIENT; CONTRACTS; LIENS; EQUITY; COMPENSATION; APPEAL AND ERROR.

1. The provision in a contract with an attorney, whereby he is to receive a percentage of the amount recovered upon a claim, will stand, although a further provision giving him a lien therefor is void under U. S. Rev. Stat. sec. 3477, U. S. Comp. Stat. 1901, p. 2320, forbidding the assignments of claims against the United States.

2. A client may, at any stage of the proceedings, displace an attorney

whose compensation is to be a percentage of the recovery, remaining liable to him for the reasonable value of services already rendered.

3. The general lien in favor of an attorney employed, for a percentage of the recovery, to prosecute a claim against the United States, does not extend to a fund rendered available by a decree obtained by his successor in the case, who was employed after the former's failure for two years to take further steps following the refusal of the Secretary of the Treasury to pay the claim in pursuance of an act of Congress procured by the first attorney, which referred the claim to the Secretary for examination and payment.

4. That an executrix is insolvent, and intends to remove from the jurisdiction of the court a fund available for the payment of a claim against her testator by attorneys who have no lien, but who had a contract with the testator to pay them a percentage of the amount that might be recovered on a claim against the government, will not give equity jurisdiction to entertain a suit by the attorneys to enforce their demand, as they have an adequate remedy in the probate court, by motion, to require the executrix to give an adequate bond, as such, in default of which her letters will be revoked.

5. One consenting to a final judgment or decree in a court having jurisdiction of the subject-matter will not be heard to complain of error therein on appeal or writ of error (following *Ganss* v. *Goldenberg, post,* 606); and an interlocutory decree may also be binding and work an estoppel in cases where it is expressly made for a particular purpose and to procure some benefit.

6. In a suit in equity to enforce a lien upon a fund, no more of the fund will be retained, subject to the process of the court pending the final determination of the cause, than is sufficient to satisfy the complainant's alleged lien, and costs of suit.

7. If the recitals of an interlocutory decree, consented to by the defendant, supplemented by his answer, amount to a waiver of the question of jurisdiction, such waiver will justify an appellate court, on an appeal from the final decree, in exercising its discretion in retaining the cause for hearing on its merits. (Following *Tyler* v. *Moses,* 13 App. D. C. 428.)

8. The reasonable value of the services of an attorney superseded without cause in the prosecution of a claim is not measured by a provision in the contract of employment, whereby he was to receive a percentage of the amount recovered.

9. An attorney employed to prosecute a claim for a percentage of the recovery, who is superseded after his delay for two years to take any further steps following the disallowance of the claim, in cir-

cumstances indicating his disinclination to pursue it further, is not entitled to compensation for services rendered before his supersession.

10. Testimony by the complainants' attorneys, in a suit to enforce a contract for fees with a deceased client, as to statements made by the decedent during his lifetime, are inadmissible, under sec. 1064, D. C. Code (31 Stat. at L. 1357, chap. 854), while similar testimony by attorneys, who were associated with the complainant and under contract with them for participation in the fees is of doubtful competency.

11. An appeal to the United States Supreme Court, from a decision of this court, denying the validity of an attorney's contractual lien, will not be allowed upon the ground that the construction of sec. 3477, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 2320, a law of the United States, has been drawn into question by the defendants, where a previous decision of that court has held such a lien void under that statute, for the reason that the construction of the statute cannot be drawn into question, as the question is no longer an open one.

No. 2371.　　　Submitted October 10, 1912.　　　Decided November 4, 1912.

HEARING on appeal by one of several defendants from a decree of the Supreme Court of the District of Columbia directing payment to the complainant from a fund under the control of the Court, in compliance with a contract for a percentage fee and an attorney's lien for prosecuting a claim.　*Reversed.*

The COURT in the opinion stated the facts as follows:

This is a suit in equity begun May 22, 1909, by Jonas H. McGowan and Elijah V. Brookshire against Emily E. Parish, executrix of Joseph W. Parish, deceased, Franklin Mac Veagh, Secretary of the Treasury, and Charles H. Treat, Treasurer of the United States, to recover part of a fund realized on a claim of said Parish against the United States.

The bill alleges that on August 4, 1900, and for a long time prior thereto, Joseph W. Parish had and had asserted a claim against the United States for a large sum of money alleged to be due by virtue of a · contract for the delivery of ice. That

he entered into a contract with the complainant Jonas H. Mc-
Gowan for the prosecution of said claim. Said contract set
out in the bill recites the employment of McGowan by Parish
to prosecute his claim for ice furnished the Army under con-
tract with the United States during the late war; and, further,
that in consideration of the professional services rendered and
to be rendered by McGowan and others whom he may employ
in the prosecution of said claim, he agrees and hereby binds
himself, his heirs, and legal representatives to pay to said Mc-
Gowan, his heirs, and legal representatives, a fee equal in
amount to 15 per cent of whatever sum of money or other in-
debtedness may be awarded or collected on account of said
claim. It is likewise agreed that McGowan shall have con-
trol of said prosecution to its final determination, with power
to receive and receipt for any draft or other evidence of in-
debtedness which may be issued in payment thereof, and to re-
tain from the proceeds of the same the amount of the fee here-
in stipulated.

Parish further agreed to furnish all the evidence and papers
that may be required in the prosecution of said claim, and to
execute and deliver to the party of the second part such pow-
ers of attorney or other papers as will be necessary for the
prosecution and collection of said claim and the payment of
said fee. It is further agreed that in no event shall said Par-
ish, assign, transfer, or otherwise dispose of said claim or any
part thereof, and this agreement shall not be affected in any par-
ticular by any revocation of the authority granted, or which
may be granted to McGowan, nor by any services rendered, or
which may be rendered by others, or by Parish, his heirs, or
legal representatives. McGowan agrees to diligently prose-
cute said claim to the best of his professional ability to its
final termination. This contract was executed by both parties
on August 4, 1900.

The bill further alleges that McGowan was a lawyer engaged
in the practice of law in the District of Columbia, practising
largely before the court of claims and the Executive Depart-
ments. That for a long time prior to said last-mentioned date

said McGowan had rendered professional services as a lawyer to the said Parish in the preparation and prosecution of said claim. That after said contract was entered into McGowan continued diligently to render his professional services in the prosecution of said claim before the Congress of the United States and various committees thereof. That on December 3, 1902, McGowan and the said Parish being desirous of securing the services of said complainant Elijah V. Brookshire, as a lawyer in the prosecution of said claim in co-operation with the said McGowan, the latter executed an assignment to said Brookshire, whereby in consideration of $5 and other valuable considerations, he assigned, sold, and transferred and set over to said Brookshire, the undivided one-third interest in the contract made between Parish and himself, bearing date August 4, 1900. It was the intention of this assignment to convey to said Brookshire 5 per cent of the recovery, or one third of whatever money might be paid to McGowan under said contract. It was further understood that this agreement would terminate with services in the present Congress, provided the bill does not pass, but in case it does pass and become a law, will then terminate with the action of the Secretary of War, and the final determination of said claim for ice by the executive and disbursing officers of the government.

It further alleges that on the 20th day of January, 1903, the said Parish and complainant Brookshire entered into an agreement in writing, which was duly executed by both parties. This agreement recites that for value received and for legal services hereafter rendered and to be rendered in the prosecution of said claim, said Parish agrees to pay said Brookshire a sum equal to 5 per cent of the amount awarded or appropriated for said claim. This contract to be an order upon the proper officers of the government, or anyone authorized to disburse said award so appropriated, and it is expressly understood that the said Brookshire shall have a lien for the amount due upon the amount of said award when same is made. Said Brookshire agreed to render the necessary legal services in the

prosecution of the above-described claim under the direction of said Joseph W. Parish.

It is further alleged that pursuant to the employment above mentioned and the agreements hereinbefore set forth, the said complainants diligently prosecuted the said claim, and rendered valuable legal and professional services in respect thereto and in preparing and making arguments before the proper committees in Congress, in collecting evidence, and in filing and presenting to said committees petitions, briefs, and arguments in their efforts to obtain an act of Congress for the relief of said Parish and providing for the settlement of said claim. Thereafter, Congress passed an act providing for the referring of the claim of said Parish to the Secretary of the Treasury for examination and payment of any balance due him, which was approved February 17, 1903 (32 Stat. at L. 1612, 1613, chap. 559).

Immediately after the passage of the act, which was drafted by the said McGowan, and which was advocated and urged in all proper ways before the several committees of the House and Senate, the Secretary of the Treasury referred to the proper officer of the government,—namely, the auditor for the War Department—the claims of said Parish and the papers relating thereto. Complainants appeared before the auditor and rendered valuable professional services, and filed briefs and arguments in behalf of the said claim. That on or about the 11th day of August, 1903, the said auditor made a finding and declared that there was a balance due to said Joseph W. Parish of $181,358.95. That on receiving the said finding and award from the said auditor, the said Secretary of the Treasury referred the same to the Comptroller of the Treasury for examination and report. The complainants appeared before the said Comptroller and submitted to him elaborate arguments. The Comptroller returned said papers with an adverse report to the Secretary of the Treasury, and thereupon further consideration was given to the said award by the Secretary of the Treasury, and the same was then referred to the Solicitor of the Treasury, before whom the complainants ap-

peared and made further arguments. The Solicitor of the Treasury returned the said claim to the Secretary of the Treasury, with an opinion adverse to the payment of the same. Thereupon the Secretary of the Treasury, at that time Leslie M. Shaw, again considered the said claim and the same was again argued before him by the complainants at great length. That on May 31, 1904, the Secretary of the Treasury declined and refused to pay any balance whatsoever, and made his final decision to that effect.

That after this decision the complainants advised with said Parish in respect to the steps necessary and proper to enforce payment of said award, and to obtain payment of the claim, and had especially under advisement and consideration the propriety of filing in the supreme court of the District of Columbia a petition for the writ of mandamus to compel the Secretary to issue a draft in favor of said Parish for the balance found to be due by the auditor, and were still considering and still had under advisement the filing of a petition for a writ of mandamus, and were awaiting the return of the said Parish to the District of Columbia, from which he had been absent for some time, until the time of his death, which occurred in the city of Washington on December 26, 1904.

That for a long time prior to the death of the said Joseph W. Parish, he and his family had been in necessitous circumstances, and, in order to relieve their pressing wants, the complainants had, from time to time, advanced to him for the benefit of himself and family various sums of money amounting in the aggregate to the sum of $5,000 relying solely upon his promise to repay the sums so loaned out of what might be recovered in respect of said claim. That after the death of said Parish, on April 30, 1905, the will of the said Joseph W. Parish was presented in the probate court of the District of Columbia by the defendant Emily E. Parish, daughter of said Joseph W. Parish, who was named in the said will as his executrix. On April 7, 1905, the will was admitted to probate and letters testamentary were issued to the said executrix and a bond approved by the court for the sum of $500.

That it was stated to the probate court that the estate of said Parish consisted of his claim against the United States and his wearing apparel. That since the probate of said will claims against the estate have been presented by different persons amounting in all to about $23,000.

That after the death of the said Parish and the probate of said will, the executrix disregarding the rights of these complainants and their interests in the subject-matter of the claim of said Joseph W. Parish, and the services rendered by these complainants, and well knowing that the complainants were ready and willing to render their services in the further prosecution of said claim, employed other counsel, without consulting with or advising complainants, for the further prosecution and collection of said claim; and on May 2, 1906, said executrix by said attorney filed in the supreme court of the District of Columbia her petition for writ of mandamus to the Secretary of the Treasury, requiring him to issue a draft in favor of said Emily E. Parish for the sum of $181,358.95, basing her petition solely on the ground that "every condition precedent to payment to said Joseph W. Parish in accordance with the act of February 17, 1903, had been satisfied by the examination made by the auditor for the War Department, and that therefore there remained only the ministerial duty on the part of the Secretary of the Treasury to pay the amount allowed by the auditor." Said petition was dismissed by judgment of the supreme court of the District; that judgment was appealed to the court of appeals of the District of Columbia, and by its judgment entered the 4th day of June, 1907, the said court affirmed the said judgment of the supreme court of the district; that an appeal was taken to the Supreme Court of the United States, and on May 17, 1909, that court reversed the judgment of the courts below, and directed that the writ of mandamus issue as prayed. That complainants are informed and believe that the mandate of the Supreme Court will forthwith be sent down, and that the said writ of mandamus will be immediately issued to the Secretary of the Treasury, commanding him to issue a draft in favor of Emily E. Parish, execu-

trix, for the sum of $181,358.95. That complainants are further informed and believe that it is the expressly declared intention of the said executrix to ignore and refuse to recognize the lien and claim of your complainants in and to the said fund, created and established in and by the contracts and agreements hereinbefore mentioned and set forth, and by the valuable and indispensable service of your complainants rendered in the prosecution of said claim, but on the contrary the said executrix and her brother Grant Parish have avowed and declared that they, the said complainants, shall never receive a cent of said money. That the said estate of Joseph W. Parish is insolvent, and that complainants believe that Emily E. Parish and Grant Parish are insolvent, and if they receive into their hands the draft or the proceeds of the draft about to be issued by the Secretary of the Treasury, they will immediately take the same out of the jurisdiction of this court for the purpose of defrauding and defeating complainants of their rightful lien and claim on the said fund.

That by reason of the premises and the professional services so severally rendered by the complainants and each of them as aforesaid, and by reason of the agreements, the complainants severally became and are the equitable owners of the tenth part or 10 per cent of the award, and are entitled to have paid to each of them and to receive one-tenth part of the amount of said award; and each one is entitled to receive, demand, and receipt for the one-tenth part or portion of any and all moneys that are or shall be paid in respect thereto.

The prayers are: First, that the court will determine and decree that each of the said complainants are entitled to 10 per cent of said award, and that they are each the equitable owners of 10 per cent of said amount.

Second, that the defendant Emily Parish, executrix, may be enjoined from applying for and receiving from the government of the United States, or any officer thereof, any draft, check, order, or warrant for the payment of the said award, and from receiving the one-tenth part of said award belonging to said

complainant McGowan, and the one-tenth part belonging to said complainant Brookshire.

Third, that the Secretary of the Treasury of the United States, the Treasurer of the United States, and their successors be enjoined from issuing any draft, check, warrant, or order to the said executrix, her assigns, or attorneys, in payment of said award or finding.

Fourth, that a receiver may be appointed by this court, with authority to demand and receive from the Secretary of the Treasury, of the Treasurer of the United States, the payment of the said award in full, and hold the same subject to the further order of this court.

Fifth, that the defendant executrix, her attorneys, agents, and representatives be enjoined from applying for, or demanding from the Secretary of the Treasury, any draft or order for said amount, or from applying for any amount from the said officers equal to one-tenth part of said award, belonging to and claimed by the complainants respectively, and for general relief.

On the same day that the bill was filed,—namely, on May 22, 1909,—a restraining order was granted, enjoining the Secretary of the Treasury from issuing the draft aforesaid to the said executrix. On June 2, 1909, before answer was filed an interlocutory decree was entered by consent. First, dissolving the order and dismissing the bill as to the Secretary of the Treasury and the Treasurer of the United States; and, further, that said restraining order is dissolved as to said executrix, provided, however, that on receipt of the sum of $41,000 and in respect of any warrant, draft, or check that may be issued therefor by the Treasury Department, or any officer thereof, as being a part of the award or finding for the sum of $181,358.95, the said executrix is enjoined from receiving the said $41,000, and is required and directed to make the proper power of attorney, authorizing and empowering Cocoran Thom, Vice President of the American Security & Trust Company, to receive any warrant, draft, or check for her as executrix, and to collect the proceeds thereof and deposit the same when

received with the American Security & Trust Company, subject to the further order of this court, and to the determination by this court whether any amount, and if so what amount, is justly due the complainants, or either of them for professional services, in respect of the matters described in the bill of complaint. Said American Security & Trust Company shall hold the said sum of $41,000 so deposited with it, and shall pay interest thereon at the rate of 2 per cent per annum: said sum, with the accrued interest thereon, to be subject to the order and decree of this court in this cause.

On August 2, 1909, the death of the complainant McGowan having been suggested, his executrix, Josephine P. McGowan, was substituted as a party complainant in his stead.

The answer of defendant, filed September 29, 1909, alleges that defendant had no personal knowledge of the several agreements set out in the bill; that she had no knowledge to what extent complainants rendered professional services to said Parish, and calls for strict proof of same. That the agreements aforesaid were in violation of sec. 3477 of the Revised Statutes, U. S. Comp. Stat. 1901, p. 2320, therefore null and void.

This defendant has, however, joined in the consent for a decree in this cause, whereby the sum of $41,000 was directed to be deposited to the American Security & Trust Company to the credit of this cause, subject to the determination of the court in this cause, whether any amount, and if so what amount, is justly due complainants or either of them for professional services rendered for and in respect of the matters described in the bill of complaint.

This defendant is advised that the utmost which either complainant could claim for legal services would depend upon their reasonable value, and the reasonable value would depend upon what legal services, if any, were rendered. In directing attention to the inhibition interposed by sec. 3477 to the relief prayed for in the bill,—to wit, that the court decree that the said McGowan has an equitable lien on said finding and award, and on the moneys made payable thereby to the amount of $18,135.89, and that the complainant Brookshire has an

equitable lien on said finding and award and moneys payable
to the amount of $18,135.89,—the object of defendant is not
to secure the transfer to another forum of any valid contention,
which it is in the power of complainants to make under their
alleged contracts, but simply to exhibit as her duty requires the
limitations imposed by law thereon, in whatever forum the
same may be adjudicated.

She admits that Congress passed the act set out in the bill,
but cannot admit or deny whether complainants did advocate
and urge the same in all proper ways before the several com-
mittees of the House and Senate, and before the auditor of the
War Department, and calls for strict proof thereof. She denies,
that after the decision made and declared by the Secretary of
the Treasury, the complainant advised with the said Parish
in respect to the steps necessary and proper to be taken to en-
force payment of said award, and had especially under advise-
ment and consideration the propriety of filing a petition
for the writ of mandamus in the supreme court of the District
of Columbia to compel the Secretary of the Treasury to pay the
same, and they were still considering and still had under ad-
visement the filing of the said writ, and were awaiting the re-
turn of said Joseph W. Parish to the District of Columbia,
from which he had been absent for some time, until the time of
his death, which occurred on December 26, 1904. This defend-
ant denies each and all of these allegations. She further avers
that never once did the complainants approach her, after her
father's death and after her qualification as executrix, in re-
spect of the steps necessary to be taken to enforce payment of
said award. In the long interval between the refusal by the
Secretary to pay and the filing of the suit in mandamus, the
suggestion of mandamus as the remedy came to her for the
first time from the counsel who filed the said mandamus in her
behalf. From no others did she ever hear of that remedy. De-
fendant says that by their action, said complainants, after the
refusal of the Secretary, abandoned all prosecution of the claim
of her testator against the United States, and sought not by any
word to correct that which their action or nonaction conveyed.

The defendant has no knowledge of the loan of $5,000, and therefore calls for strict proof. That if the said indebtedness did exist it was a simple contract indebtedness, and was payable out of the general assets of the estate; and like any other simple contract obligation was barred by the statute of limitations. She pleads the statute of limitations in bar thereof.

Defendant denies that after the death of the said Parish she disregarded the rights of said complainants, and denies that complainants were ready and willing to render their services in the further prosecution of said claim. She alleges that from May 31, 1904, when payment was refused, to the 2d of May, 1906, when her mandamus suit was filed, the complainants did not ever impart to this defendant their readiness or willingness to institute a mandamus suit or any other suit for the enforcement of her rights. On information and belief, she avers, that at least one of the complainants did repeatedly assert that the remedy by mandamus was inapplicable, and could not be maintained.

It is true that Emily E. Parish did employ counsel and attorneys without consulting or advising complainants for the further prosecution of the claim. She denies that everything needed to gain the case had been accomplished by the act of February 17, 1903, aided by the finding of the auditor of the War Department, because same had been canceled by the decision of the Secretary of the Treasury.

She denies that it is the intention of herself, her agents, or attorneys to ignore and refuse to recognize any valid claims against the estate of her testator, and denies that none of the claims filed and proved in the probate court have been paid in part, but on the contrary avers that all such claims have been paid and satisfied, and in consequence her account passed and approved. She denies that she or her brother is insolvent.

She further alleges that by the terms of the contract with said McGowan he agreed to diligently prosecute said claim to its final determination. She alleges that there was a breach of contract as to this by the said McGowan, and that the determination to which McGowan prosecuted the claim, was a de-

termination that it had failed; and it was left to others, having no connection with him, to prosecute said claim to a determination that was a success. That had said defendant known that she could rely on said McGowan to prosecute said claim to a final and successful termination, it would have been perfectly agreeable to her to have paid 15 per cent, instead of what she did pay. But because said McGowan altogether ignored her wishes, interests, and duties, and silently abandoned the cause he had agreed to prosecute, this defendant resorted to total strangers to take up an abandoned cause. Apparently said complainants agreed with the Secretary that discretion was given to him to decide as he did. Certainly they took no steps to assert, still less to demonstrate, the contrary. Two years had passed, and only one year more remained for any steps which could be taken for the assertion of any right which she possessed, when, having received no advice, suggestion, or communication even from said McGowan or said Brookshire, by the advice exclusively of others she filed the petition for mandamus, which was rewarded finally with complete success. She therefore alleges that said McGowan never gave, sought, or pretended to give the consideration called for by his said alleged contract; that by failing in the important step of prosecuting said claim, to its final determination, he disentitled himself to compensation for prior services rendered under his alleged contract, if such were rendered; and is not entitled to anything for the final prosecution of a claim which he did not prosecute to its final determination.

Testimony was taken. On October 19, 1911, a final decree was entered sustaining the bill and directing the payment, after satisfying the costs out of the moneys held by the American Security & Trust Company, to the complainants respectively the sum of $18,135.39, with interest at 6 per cent per annum from the 7th of June, 1909, and that any sum so remaining after the discharge of said claims be turned over to the defendant as executrix.

*Mr. Holmes Conrad* and *Mr. Leigh Robinson* for the appellant.

*Mr. Nathaniel Wilson* and *Mr. J. J. Darlington* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is not the case of a creditors' bill to enforce a lien created by a decree of court as was *Price* v. *Forest,* 173 U. S. 410, 43 L. ed. 749, 19 Sup. Ct. Rep. 434. It is an original suit on written contracts with attorneys to prosecute a certain claim against the United States to final determination, for stipulated fees equal to 20 per cent of the amount that might be collected, and with an express lien to secure the payment of the same. Setting out the contracts, the bill alleges the prosecution of the claim before Congress to the passage of a relieving act; the diligent, but unsuccessful attempt to obtain payment under said act from the Secretary of the Treasury; and a readiness and willingness to continue the performance of the contract until prevented by the wrongful acts of the said claimant, and of his executrix, who succeeded to the legal control of the claim after the death of the claimant, December 26, 1904. Upon the allegations of the insolvency of the executrix, and her intention to remove the funds from the jurisdiction of the court, an injunction to prevent her receiving the fund was obtained. It cannot be controverted that contracts like those set out in the bill—in so far at all events as they attempt to assign, or create a lien upon, a claim against the United States,—are prohibited by sec. 3477, Rev. Stat., U. S. Comp. Stat. 1901, p. 2320, and thereby made absolutely void. *Nutt* v. *Knut,* 200 U. S. 12–21; 50 L. ed. 348–353, 26 Sup. Ct. Rep. 216; *National Bank* v. *Downie,* 218 U. S. 345, 54 L. ed. 1065, 31 Sup. Ct. Rep. 89, 20 Ann. Cas. 1116: It was said, however, in *Nutt* v. *Knut,* supra, that the provision of a contract evidencing an agreement to pay the attorney a fixed portion of the sum that might be recovered through his services might stand alone notwithstanding the illegality of the provision for the lien; such provision giving the attorney no interest in the claim itself and creating

no lien thereon. That case was prosecuted to judgment in a State court. As stated in the opinion of the Supreme Court of the United States—on error to the State court—"No lien is asserted by the plaintiff in his pleadings. While the original petition asserted his right to be paid in accordance with the contract, the plaintiff claimed, if he could not be paid under the contract, that he be compensated according to the reasonable value of his services." The plaintiff had prosecuted the claim to final allowance and appropriation for its payment. The question of jurisdiction in equity to entertain the case did not arise; and apparently could not have arisen under the procedure of the State. No such amendment was made in the case at bar. The complainants sued upon the contract as a whole, claiming the fee as fixed thereby, as well as the lien. Had there been an amendment abandoning the lien and relying on the *quantum meruit,* solely, the equity court would have been without jurisdiction.

It is contended that the allegations of the bill are sufficient to show that complainants had an attorneys' lien upon the fund finally adjudged to the claimants' executrix, which could be enforced by the equity court. The bill alleges that complainants rendered the services that procured the act of Congress, and also made diligent efforts to secure payment under that act by the Secretary to the time of his final refusal; that they were ready and willing to continue the prosecution of the claim to final determination, and could have done so had not the claimant during the remainder of his life, and his executrix thereafter, refused to continue their services. Assuming for the present that these facts were proved as alleged, the fact remains that after dispensing with their services, the executrix employed other attorneys, who instituted and prosecuted the mandamus proceeding which resulted in the final judgment, under a special contract for a liberal fee. The executrix had the right, nevertheless, to dispense with complainants services at any stage of the proceeding and retain other counsel (*Re Paschal* [*Texas* v. *White*] 10 Wall. 483, 19 L. ed. 992); though she could not thereby defeat their right to compensation for the

. reasonable value of their services before performed. Contracts for contingent fees are not illegal, and an attorney prosecuting a cause under such contract is entitled to a lien upon a judgment recovered by him therein as well as upon collections made by him thereunder; but the lien does not extend to a judgment recovered by other independent attorneys without his co-operation. In *Re Wilson,* 12 Fed. 235–237. In that case it was held in accordance with an able opinion of Judge Brown that an attorney had no lien upon a judgment in one cause for services rendered in another and related one. His conclusion was thus stated: "After examination of the numerous authorities on this subject, English and American, I am satisfied, * * * that an attorney has no general lien upon an uncollected judgment for services in other suits, but only a particular lien for his costs and compensation in that particular cause." See also *Massachusetts & S. Constr. Co.* v. *Gill's Creek Twp.* 48 Fed. 145–147; *Foster* v. *Danforth,* 59 Fed. 750, 751; *Adams* v. *Kehlor Mill. Co.* 38 Fed. 281, 282. In the case last cited a judgment had been obtained in a State court, and the judgment on which the lien was claimed had been recovered in a suit to enforce the former judgment. The facts presented a stronger case than the one at bar. In the present case the Secretary had refused to perform the act of Congress, and without his favorable action the claim was uncollectable. Nearly two years afterwards independent counsel instituted the litigation which resulted in the judgment compelling payment. There was, therefore, no attorneys' lien on which to found jurisdiction in equity.

The allegation of the insolvency of the executrix, and her intention to remove the fund from the jurisdiction upon its receipt, furnish no foundation for a creditors' bill to enforce a simple contract. They were pertinent allegations in the bill for the purpose of obtaining the injunction prayed. It was not a creditors' bill founded on a simple contract, invoking the interposition of equity under extraordinary conditions to prevent certain and irreparable injury, so as to bring it within some of the exceptional cases in which a creditors' bill has been entertained

upon a simple contract unreduced to judgment. Had such been its character and avowed purpose, it would seem that the complainants were not without adequate remedy in another branch of the supreme court of the District. The will of J. W. Parish had been probated in the supreme court of the District holding a special term as a probate court, and was still in administration. The sole power of the executrix to demand the payment and to institute the action to enforce it was derived from the letters testamentary granted to her on the probate of the will. The complainants could have applied for relief to that court which, under the ample power conferred by the statute, could have required the executrix to give additional and sufficient bond for the protection of creditors, or else have revoked her letters and thus prevented her collection of the judgment. D. C. Code, secs. 263–296 [31 Stat. at L. 1232–1236, chap. 854].

Ignoring the claim of the void contract lien, there was nothing on the face of the bill to confer jurisdiction in equity. Hence the court might, in the exercise of its discretion and of its own motion, have dismissed the bill for want of jurisdiction, and should have sustained an objection thereto if presented. Were there nothing else in the case, this court would in the exercise of its discretion under such conditions direct the dismissal of the bill.

It remains, therefore, to consider the effect claimed for the interlocutory decree entered by consent of the parties. The decree was entered before the answer was filed, and no objection was raised therein to the jurisdiction. There is no question but that one consenting to a final judgment or decree in a court having jurisdiction of the subject-matter will not be heard to complain of error therein on appeal or writ of error. *United States* v. *Babbitt,* 104 U. S. 767, 26 L. ed. 921; *Nashville, C. & St. L. R. Co.* v. *United States,* 113 U. S. 261–266, 28 L. ed. 971–973, 5 Sup. Ct. Rep. 460; *Ganss* v. *Goldenberg, post,* 606. An interlocutory decree by consent may also be binding, and work an estoppel in cases where it is expressly made for the particular purpose and to procure some benefit. *Re Metropoli-*

*tan R. Receivership (Re Reisenberg)* 208 U. S. 90–110, 52
L. ed. 403–412, 28 Sup. Ct. Rep. 219. But in that case, which
was one for a receivership, the defendant for its own advantage
consented to the appointment on a bill filed by simple contract
creditors, and did not seek to avoid the consequences of its con-
sent by which others were effected. The language of the court
was elicited on a proceeding by one who attempted to inter-
vene in the cause and had been refused leave.

The restraining order in this case stopped the payment of
the entire fund of $181,358.95 in the hands of the Treasurer
of the United States. It may be readily inferred that the
consent to the decree was given to retain a sum sufficient to
safely cover the full claim of complainants, namely $41,000,
in order that the remainder of the fund might be withdrawn at
once from the Treasury. It is true that the defendant profited
by the decree modifying the restraining order and releasing the
remainder. But that would seem no more than she was en-
titled to demand of the court in any event; for even if the com-
plainants' lien had been valid and enforceable, they could not
insist upon retaining more, subject to the process of the court,
than enough to satisfy their lien and the costs of suit. The
suit was upon the contract, as we have seen, and to enforce the
lien created thereby. It was upon that contract, and lien that
the equity jurisdiction was invoked and assumed; and it was
upon the assumption of that jurisdiction that the interlocutory
decree was founded.

The answer of the defendant, filed after the entry of the
decree, shows that she regarded the suit as based solely upon
the entire contract. She attacked the contract as illegal and
void, and submitted that issue for determination. She also
sought to avoid it by alleging the failure of complainants to
prosecute the claim to final determination; and also charged its
voluntary abandonment. She presented no objection to the
jurisdiction, and none was necessary under the allegations of
the bill, as the case presented turned upon the validity of the
contract and would be disposed of by its determination. Cer-
tain recitals of the decree, supplemented by the answer, would

seem, however, to amount to a waiver of the question of jurisdiction to the extent that complainants might claim the reasonable value of their services, and such waiver would, under the circumstances, justify an appellate court in exercising its discretion in retaining the cause for hearing on its merits. *Reynes* v. *Dumont,* 130 U. S. 354–395, 32 L. ed. 934–945, 9 Sup. Ct. Rep. 486; *Kilbourn* v. *Sunderland,* 130 U. S. 505–514, 32 L. ed. 1005–1008, 9 Sup. Ct. Rep. 594; *Brown, B. & Co.* v. *Lake Superior Iron Co.* 134 U. S. 530–536, 33 L. ed. 1021–1025, 10 Sup. Ct. Rep. 604; *Hollins* v. *Brierfield Coal & I. Co.* 150 U. S. 371–381, 37 L. ed. 1113–1115, 14 Sup. Ct. Rep. 127; In *Re Metropolitan Receivership (Re Reisenberg)* 208 U. S. 90–110, 52 L. ed. 403–412, 28 Sup. Ct. Rep. 219; *Tyler* v. *Moses,* 13 App. D. C. 428–443. The recital of the decree is that the $41,000 shall be held subject to the further order of the court, "subject to the determination by this court ·in this cause whether any amount, and, if so, what amount, is justly due the complainants or either of them for professional services rendered by them or either of them for and in respect of the matters described in the bill of complaint." The answer reciting the above proceeds as follows: "This defendant is advised, and, being so advised, charges, that the utmost which either complainant could claim for legal services would depend upon their reasonable value; and that their reasonable value would depend upon what legal services, if any, have been rendered. In directing attention to the inhibition interposed by said sec. 3477 to the relief prayed for in the bill, *viz.,* that the court decree the said Jonas H. McGowan 'has an equitable lien on said finding and award and on the moneys payable, and that may be paid thereunder to the amount and in respect of $18,135.89,' the object of defendant is not to secure the transfer to another forum of any valid contention, which it is in the power of complainants to make under their alleged contracts, but simply to exhibit, as her duty requires, the limitations imposed by law thereon, in whatever forum the same may be adjudicated."

Under the views expressed, this decree and pleading fur-

nished a ground for amending the bill, converting the suit into one on a *quantum meruit.* No amendment was had, and the cause was heard upon the theory that the allegations of the original bill were sufficient for the purpose. While evidence was taken at length to show the character of the services rendered to the time of the rejection of the claim of the Secretary, there was no evidence of their reasonable pecuniary value. The sole reliance for proof is the express stipulation of the contract. The admissibility and sufficiency of this is rested on the opinion of the court in *Nutt* v. *Knut,* 200 U. S. 12–21, 50 L. ed. 348–353, 26 Sup. Ct. Rep. 216. After holding that the contract for the lien was void, but that the agreement for the fee could nevertheless be enforced, it was there said: "Such an agreement did not give the attorney any. interest· of share in the claim itself, nor any interest in the particular money paid over to the claimant by the government. It only established an agreed basis for any settlement that might be made, after the allowance and payment of the claim, as to the attorneys compensation." The court was not then considering the evidence on which the demand was submitted in the court below. There is, moreover, an essential difference between the two cases. In that it appeared that the plaintiff had prosecuted the claim with diligence to final and successful determination. All that remained was to receive the money appropriated. The labor of the attorney was completely performed, and nothing remained for him to do but to demand and receive his share of the second and final payment made to his client. Assuming that complainants were superseded in this case, without cause, by the defendant, yet the fact remains that the claim was still denied, and was not put in a situation for collection until some years thereafter. It was through the intelligent efforts and arduous labors of other attorneys that the action instituted by them resulted in forcing the final payment of the claim. As we have seen, a party may change his attorney at any time before the litigation shall have ended, remaining liable, of course, to the superseded attorney for the reasonable value of the services already performed by him. *Re Paschal (Texas* v. *White)* 10 Wall. 483–496, 19 L. ed. 992–997. But it does not follow that the terms of the original contract furnished the measure of the rea-

sonable value of the services partly performed. Such a doctrine would throw upon the client the burden of showing that the services performed were not of the actual value of the contract stipulation. It has no logical or just foundation. These conclusions would require the decree to be reversed and the cause remanded so that the pleadings may be amended and proof introduced on the issue of reasonable value. But it would serve no useful purpose to prolong the cause should the evidence fail to show that the complainants performed their contract so far as permitted by the claimant and his executrix, and indicated their readiness and willingness to continue the same to the final determination of the claim.

The original contract was with Jonas H. McGowan, who was thereby given control of the prosecution of the claim. An interest of one third in the fee contracted for was subsequently assigned by McGowan to complainant Brookshire. Later, another contract was entered into between Parish and Brookshire, whereby the latter was to receive an additional fee of 5 per cent. It seems to be a settled rule of law that an attorney who is retained generally to conduct a cause is under obligation to conduct the proceeding to its termination. *Nicholls* v. *Wilson,* 11 Mees. & W. 106, 2 Dowl. N. S. 1031, 12 L. J. Exch. N. S. 266; *Tenney* v. *Berger,* 93 N. Y. 524–529, 45 Am. Rep. 263. This, however, McGowan expressly promised in the concluding paragraph of his contract. The evidence shows that McGowan and attorneys acting under and in co-operation with him labored long and earnestly in procuring an acknowledgment by Congress of this ancient claim, during which period there was complete harmony with the claimant. McGowan himself drafted the bill which became a law February 17, 1903. Just as the troubles seemed to have ended, they began afresh. The act was an ambiguous one, and the Secretary of the Treasury held that it vested him with discretion to examine and pass upon the right of the claimant to an assessment of damages. Although complainants diligently prosecuted the demand before the Treasury Department, the Secretary rejected it on May 31, 1904. It appears that shortly after the Secretary's decision a conference was had—Parish being present—to consider what

additional steps might be taken to prosecute the claim. Three plans were considered,—mandamus to the Secretary; a rehearing before him; reference to the court of claims. Nothing was decided upon. Later, in August, 1904, Parish said he would like the opinion of some attorney not connected with the case. He produced an opinion, but what it was does not appear. It seems to have been given August 8, 1904. It was suggested that the opinion of other and more distinguished counsel be obtained; but none was had. The matter seems to have rested a while in this condition. Parish was then in Washington, where he remained until his death December 26, 1904. On August 16th, desiring to raise money on his claim, he wrote McGowan to that effect, saying that if given a free hand he had the prospect of raising money to meet pressing demands at a reasonable cost. He asked for the return of a power of attorney held by McGowan. The power of attorney apparently referred to is one given to McGowan on March 25, 1903, making him his attorney to prosecute the claim before the Treasury Department and conferring general powers of representation. McGowan wrote back from Ontario, under date of August 21, 1904, saying he did not have the paper with him, but consenting to any arrangement Parish might make for a loan. It seems that Parish was negotiating with one Whitney, and under date of August, 31, 1904, Mr. E. P. Morey, who had been associated with complainants, wrote Whitney that there was every reason to believe that if other plans failed in the next ninety days, at the next session of Congress a direct appropriation would be made for payment of the full amount due as found by the auditor. Nothing apparently was effected in the matter of the loan. The next thing that occurred was the following letter from Parish, which was produced from the files of McGowan's letters by his partner, the witness Serven:

Committee On Claims,
House of Representatives, U. S.
Washington, D. C. Sept. 15, '04.

Hon. J. H. McGowan,
My Dear Sir and Friend:—
Your letter of the 25th ult. received in due time and contents

noted, which I answered best I could but have no answer thus far to hand and will repeat in substance what I wrote, to wit: You will remember before you left Washington for your summer respite, you said substantially that you had done your best to get the auditor's report in my case paid by the Secretary of the Treasury, and failed, etc., "that you turned over to me the case to be managed in the future and do whatever I deemed best," etc.

Some time next Congress I propose to organize a practicable method and resurrect the claim from its unfortunate condition, and I must have unrestricted and unrestrained control. If an attorney is required after I get the matter advanced in Congress there will be no trouble to find one. Furthermore I said that I would reimburse those who had advanced money to promote the case thus far, and will do very much better for you than you expressed yourself to Mr. Brookshire, to wit, "that you would be glad and well satisfied to get the money advanced me" returned. My past record as to compensation—who had rendered me service you have not surely forgotten which was generous and as I remember very satisfactory to all concerned as living witnesses will testify. I am in the best of health and my time profitably employed in assisting an Illinois firm who is doing business here and in New York.

Yours hastily,

J. W. Parish, 217 A. Str., S. E.

This letter either recited the truth as to McGowan's surrender of the case before going to Ontario, or a deliberate falsehood. A slight circumstance supporting its truth is the letter asking the return of the power of attorney and McGowan's consent thereto. Another circumstance is found in the testimony of McKee, an impartial witness, who had been journal clerk of the House of Representatives, and in the year 1904 had resigned to practice law. About a week before his death Parish asked witness to take up his claim, and several conversations were had. Witness called upon McGowan and asked him who

were the attorneys of record. McGowan said that he had pre-
pared it and followed it up to the time it was rejected by the
Secretary, and added: "I don't care who collects it, I want my
fee out of it." If false, McGowan was under obligation to con-
tradict it. It is probable that other counsel associated with Mc-
Gowan were not aware of this letter; but whether so or not,
they are bound by his actions. E. L. Morey, one of the associ-
ates, testified that he called at Parish's house in October, 1904,
to make an appointment with him for a consultation in refer-
ence to further proceedings. Not finding him, he left word for
him to call at the office. Parish did not come. The following
letter was received by Parish from Morey, to which no response
was made in any way:

                                   Sunday, October 9, 1904.
Dear Mr. Parish:—

I called at your house to-day but failed to find you. I am
extremely anxious to see you, as I have some very important
news concerning your case, and therefore ask that you call at
my office to-morrow morning without fail. However, if for
any reason you do not care to call at my office, telephone me
and I will meet you at any place you suggest.

                                   Yours truly,
                                   E. P. Morey.

The letter to McGowan, above recited, remained unanswered.
If its recitals were true, no reply was necessary; if untrue it
should have been replied to promptly. The parties apparently
met no more. On November 19, 1904, the following letter was
mailed to Parish and received by him:

                                   November 19, 1904.
Mr. J. W. Parish,
    217 A. Str. S. E. City.
Dear Sir: —

We have done what we could to secure an interview with you

concerning the ice claim. You have deliberately avoided us. The time has come when the matter should have attention. If we do not see you on or before Wednesday next, we shall proceed as we deem best under the ample authority which we have.

Yours truly,

J. H. McGowan,

E. P. Morey,

E. V. Brookshire.

Parish promptly replied to what he characterized as an "impudent and discourteous" letter, giving notice that he would not submit to methods which he called "bulldozing." There was also a sarcastic allusion to the ability displayed in the proceedings before the Secretary. Parish's letter of September 15 indicated that his plan was to apply for relief at the coming session of Congress. At any rate he began no litigation if he may have contemplated any. He died December 26, 1904, leaving a will but no property save the expectancy of this claim. The executrix took no substantial action looking to the collection of the claim, though she had some conversation with McKee and others relating to it, which resulted in nothing, until on November 5, 1905, she entered into a contract with Mr. Holmes Conrad for the prosecution of the claim. He and his associate, Mr. Robinson, filed the petition for mandamus against the Secretary of the Treasury on May 2, 1906. Defeated in the trial court and the court of appeals, they obtained a reversal of the adverse decisions by the Supreme Court of the United States on May 17, 1909. See *United States ex rel. Parish* v. *MacVeagh,* 214 U. S. 124, 53 L. ed. 936, 29 Sup. Ct. Rep. 556.

The executrix knew the former history of the claim and that complainants were the attorneys engaged in it to the time of its failure in the Treasury Department; but she had no knowledge of the written contracts. No legal steps had been taken by complainants under the ample authority claimed in their letter of November 19, 1904, before mentioned, before the death of Parish. Knowing of his death and the qualification of defendant as his executrix, they gave her no notice of their contracts

and their readiness to proceed with their performance with her consent. The counsel finally retained by her had no notice of complainants' contracts; and no offer of assistance was made to them.

The executrix could readily have supposed from her father's letter to McGowan, and the latter's failure to reply thereto, that he had regarded the prospect for the collection of the claim such as not worth further efforts on his part, and was willing to let others undertake it. He said to McKee in December, 1904, that he did not care who collected it. That he also stated that he wanted his fee out of it is of no importance. He was entitled to no fee unless he prosecuted the case to final determination. Nor was he entitled to have the reasonable value of his services before rendered, without showing his willingness and readiness to proceed diligently, and the rejection of such tender by the executrix. The burden was upon the complainants to show this tender of their services, and there is no evidence of it. Now that the claim has been collected by others acting independently as attorneys for the executrix, it seems a great hardship to complainants to receive no compensation for the effective services that they rendered in obtaining the legislation on which the successful litigation was founded; but it is the result of their own action or inaction at the critical time.

Several questions of evidence were raised at the hearing, relating to statements made by the deceased, Parish. So far as these were testified to by one of the complainants they are inadmissible by virtue of the provisions of the Code (sec. 1064 [31 Stat. at L. 1357, chap. 854]) and have not been considered. While there may be some doubt as to the competency of similar evidence given by the attorneys, who were associated with the complainants and under contract with them for participation in their fees, we have considered the evidence without passing upon the question of its admissibility.

For the reasons given we will reverse the decree, with costs, and remand the cause with direction to dismiss the bill. It is so ordered.                    *Reversed and Dismissed.*

A petition by the appellees for a rehearing was denied December 2, 1912.

An application by appellees for allowance of an appeal to the Supreme Court of the United States was denied January 13, 1913, Mr. Chief Justice SHEPARD delivering the opinion of the Court:

Appellees, Josephine P. Mc Gowan et al., pray for an appeal to the Supreme Court of the United States, basing their right thereto upon the ground that the construction of a law of the United States is drawn in question by the defendant Emily E. Parish.

The defendant relied upon sec. 3477, Rev. Stat., U. S. Comp. Stat. 1901, p. 2320, as prohibiting the lien claimed by the plaintiffs, and on that rests the contention that the construction of a law of the United States is drawn in question.

The right to appeal is one of substance, and not of mere form. The question of the validity of the lien is one that had been settled by the Supreme Court of the United States in construing sec. 3477, and was no longer an open one. The construction of the act could not, therefore, be drawn in question. *Kansas* v. *Bradley,* 26 Fed. 289; *Harris* v. *Rosenberger,* 13 L.R.A.(N.S.) 762, 76 C. C. A. 225, 145 Fed. 449–452.

We are constrained to refuse the allowance of the appeal.